Below is a Memorandum Decision of the Court.



_____
**Paul B. Snyder**
**U.S. Bankruptcy Court Judge**
(Dated as of Entered on Docket date above)

_____

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

In re:

DARWIN EDWARD CLEMENT and JUDITH
ANN CLEMENT,

                          Debtors.

R.K. HOOVER COMMERCIAL
CONTRACTING, INC. d/b/a HOOVER
CONSTRUCTION, a Texas Corporation,

                          Plaintiff,

v.

DARWIN EDWARD CLEMENT and JUDITH
ANN CLEMENT,

                          Defendants.

**Case No. 15-44555**

**Adversary No. 15-04188**

**MEMORANDUM DECISION**
**(Not for Publication)**

This matter came for trial before the Court on September 6 and 7, 2016, on the complaint filed by R.K. Hoover Commercial Contracting, Inc., d/b/a Hoover Construction (Hoover) against Darwin Edward and Judith Ann Clement (Debtors), alleging nondischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6)[1], and denial of discharge pursuant to § 727(a)(4).  On the Debtors' Motion in Limine, Hoover agreed that it would not present

_____
[1] Unless otherwise indicated, all chapter, section and rule references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM DECISION - 1

undisclosed evidence or witnesses.  The Court also ruled that the Debtors had an additional two weeks to file a response to Hoover's defalcation of fiduciary duty theory under § 523(a)(4) raised for the first time in its Trial Brief.  At the conclusion of Hoover's case, pursuant to Fed. R. Civ. P. 41(b) made applicable by Fed. R. Bankr. P. 7041, the Debtors moved to dismiss Hoover's claims under § 523(a)(2)(B) and (a)(6), for failure to prosecute.  Hoover acknowledged that it no longer was pursuing these claims.  The Court took the remaining matters under advisement.  Based on the evidence, arguments of counsel, and pleadings submitted, the Court makes the following findings of fact and conclusions of law.

Hoover, a general contractor, was awarded a construction contract by Burlington Coat Factory of Washington, LLC (Project), in July 2014. The Debtors submitted two bids to Hoover, one for demolition and one for electrical work; the only bid at issue is the one to complete the electrical improvements (Electrical Project).  Hoover accepted both bids, and on July 31, 2014, signed a contract (Contract) with the Debtors' business, D.E.C. Construction (DEC), a sole proprietorship.  The contract price for the Electrical Project was originally $295,235.  A condition of the contract was Hoover's retainage of 10% of the fixed contract amount.  The original contract price increased to $440,930.65 due to numerous change orders expanding the scope of work. The Debtors believed their bid would provide them a 30% profit, but they subsequently realized they had significantly underbid the project.

The Debtors commenced work in late August 2014 and substantially completed the Electrical Project by December 2014.   During this time, the Debtors hired numerous subcontractors, and purchased supplies and materials from vendors.   The Debtors were permitted to submit requests for progress payments, which were based on the percentage of the Electrical Project completed.   As a condition for payment, the Debtors were required to submit a Partial Conditional Waiver and Release on Progress Payment (Progress Release), which contains the following language:

MEMORANDUM DECISION - 2

**Below is a Memorandum Decision of the Court.**

The signer warrants that the signer has already paid or will use the funds received from this progress payment to promptly pay in full all of the signer's laborers, subcontractors, material men, and suppliers for all work, materials, equipment, or services provided for or to the above referenced project in regard to the attached statement(s) or progress payment request(s).

The Contract between Hoover and DEC does not contain a similar requirement or language to this effect.

During the course of the Electrical Project, the Debtors submitted four requests for progress payments, each accompanied by a signed Progress Release, and Hoover issued checks in the requested amounts, as follows:

| | | | |
|---|---|---|---|
| 9/5/14 | $47,828.07 | Signed by Darwin Clement | Check issued 9/4/14 |
| 9/29/14 | $42,596.28 | Signed by Judith Hamblen | Check issued 9/29/14 |
| 10/20/14 | $52,922.56 | Signed by Darwin Clement | Check issued 10/17/14 |
| 11/24/14 | $122,364.90 | Signed by Judith Clement | Check issued 11/24/14 |

These payments totaled $265,711.81. Thereafter, Hoover became aware that the Debtors were not paying all of the subcontractors (use of this term includes laborers and suppliers for purposes of this Memorandum Decision) in full. Hoover stopped making progress payments and paid the remaining $175,218.84 on the contract directly to potential lien creditors for the Electrical Project.

Ms. Clement testified that she previously had seen a partial lien release, such as that contained in the Progress Release, and she understood it to mean that a contractor has been paying or will pay the funds received toward job expenses. Addressing each of the four Progress Releases in chronological order, Ms. Clement testified that the September 4 and September 29 progress payments were used to pay job related expenses, and that DEC was current on payments as of those date. Ms. Clement testified that she used the October 17 progress payment for job expenses, and that it was possible DEC may have been behind on job expenses at that time. She testified that she did not notify Hoover, however, because they were likely behind on materials on order that they could not yet invoice.

MEMORANDUM DECISION - 3

Ms. Clement testified that when she requested the November 24 progress payment, DEC was not current on the payment of all job expenses and she communicated this to Hoover over the phone prior to November 24, 2014.  In later testimony, however, Ms. Clement acknowledged that before the November 24 progress payment, she had not specifically advised Hoover that they were behind on payments to particular subcontractors because Ms. Poulin had not asked, and she was hoping they could still complete the project without additional funds from Hoover.  She also testified that after this payment, she did not notify Hoover that the Debtors were unable to pay their subcontractors in full, but did inform Hoover they were behind and trying to make it work.

Ms. Poulin testified that as of November 24, 2014, she had not received any communications from subcontractors hired by DEC that they were not being paid.  It was not until December 2014, two weeks after the November 24 progress payment, that she first became aware there were unpaid suppliers when Platt Electric Supply and Tradesman International contacted Hoover.  Ms. Poulin was surprised to learn there were outstanding invoices dating back to August 2014.  Additionally, Ms. Poulin testified that Ms. Clement never informed her in their weekly communications through November 2014 that the Debtors were not current with all of their subcontractors.  Ms. Poulin testified that she does not believe the Progress Release submitted by the Debtors in November was accurate.  Additionally, had she known the subcontractors were not being paid, Hoover would have issued checks directly to them rather than to DEC.

On January 8, 2015, Hoover issued a check to Tradesman in the amount of $64,098.82 as full payment for the services Tradesman provided.  On January 30, 2015, with the consent of Ms. Clement, Hoover paid Platt Electric $111,120.02 as full payment for the services Platt Electric provided.  Ms. Clement testified, however, that Hoover did not use a joint check as

MEMORANDUM DECISION - 4

requested, which eliminated any leverage the Debtors had with Platt Electric, as she believed they had been overbilled.

Taking into account the payments made directly to Pratt Electric and Tradesman, the total amount of payments made by Hoover on the entire Electrical Project was $440,930.65. On February 11, 2015, Ms. Clement signed a Final Unconditional Lien Waiver acknowledging receipt of payment of $440,930.65, and that it constituted the entire balance due and owing for all work performed and materials supplied by DEC, their subcontractors, material vendors, suppliers, agents and employees in connection with the Electrical Project. Thereafter, Ms. Poulin became aware that there were other subcontractors on the Electrical Project that had not been paid. Ms. Poulin testified that she tried to contact Ms. Clement, but she would not respond. After an investigation, Ms. Poulin confirmed that E-Squared Systems, LLC, which had outstanding invoices dating back to October 14, 2014, had valid lien rights and therefore issued it a check directly in the amount of $38,323.00. Ms. Poulin also confirmed that Sunbelt Rentals, Inc., which had outstanding invoices dating back to September and October 2014, had valid lien rights and therefore issued it a check in the amount of $5,677.09. Both E-Squared and Sunbelt Rentals released their liens upon receipt of payment.

Two additional companies asserted claims on the Electrical Project: United Rental (North America), Inc. and Intracommunications Network Systems, Inc. Ms. Poulin determined that they did not have valid lien rights and therefore did not make any payment to them.

While working on the Electrical Project, Mr. Clement was employed by DEC as a job site supervisor and journeyman, and Ms. Clement was employed as a contract and office administrator. Ms. Clement testified that when she received progress payments, she would pay DEC's employees first and then subcontractors and suppliers in order of latest invoices owing. The Debtors also took compensation draws from DEC's bank account, generally around $1,000 a week. Ms. Clement believed that the entire compensation received in the approximate amount

MEMORANDUM DECISION - 5

of $47,000 on the Electrical Project, including an involuntary payment to the Internal Review

Service (IRS), was reasonable compensation for both Debtors' work.   The operating bank

account for DEC, Exhibit No. 38, indicates a withdrawal by the IRS for $27,327.50 on December

8, 2014.  Ms. Clement testified that the Debtors had a $500/month payment plan with the IRS,

but the IRS unilaterally took approximately $27,000 from the DEC bank account without any

notification or authorization; thus, the withdrawal was involuntary.  Testimony of Ms. Clement

indicated that the DEC operating bank account also included deposits from other sources in

addition to Hoover, as DEC was working on other projects in addition to Hoover's.

Ms. Clement testified that when she submitted the November 24, 2014 Progress Release,

it was not her intent to retain the money.  Rather, she intended to pay everyone associated with

the job and have a job well done. She did not recall taking any draws for compensation after this

progress payment.   Ms. Poulin testified that Hoover was satisfied with the quality of the

completed Electrical Project.

Hoover filed a complaint against the Debtors d/b/a DEC in Thurston County Superior

Court (Superior Court) to recover damages incurred for having to pay subcontractors above the

contract price due to the Debtors' failure to pay them. On May 12, 2015, the Superior Court

entered an Order of Default and Default Judgment (Judgment) against the Debtors in the

principal amount of $61,463.92, attorney's fees of $4,225.00, and costs of $314.50, for a total

amount of $66,003.42.

On September 30, 2015, the Debtors filed a voluntary chapter 7 petition.  Hoover was

listed as a creditor in the schedules and list of creditors, and Hoover's garnishment against the

Debtors was set forth in the Statement of Financial Affairs (SOFA).  In No. 1 of the SOFA, which

requires disclosure of gross income received during the two years preceding the calendar year

in which the debtor filed bankruptcy, the Debtors reported income of $18,330 for 2013, but

MEMORANDUM DECISION - 6

reported no other income.  The Debtors also listed $0 income in their Schedule I.  The Debtors never filed amendments to their petition, schedules or SOFA.

Ms. Clement testified that when the Debtors filed bankruptcy, their 2014 tax return had not yet been prepared and their business books were not closed, thus she did not know their 2014 personal income.  The 2014 tax return was subsequently prepared and filed.  She testified that IRS Form 1099 prepared by Hoover, which indicates gross income in the amount of $379,727.09 to DEC in 2014, was provided to the Debtors' bankruptcy attorney.  She further testified the she had gross income from other companies in 2014, as set forth in Exhibit 33.  She did not know why her attorney did not include this income in her SOFA.   Ms. Poulin testified that the absence of disclosure of Debtors' 2014 income did not hinder or inhibit Hoover's ability to sue or collect amounts owing by DEC.

Ms. Clement testified that the Debtors had income in 2015 prior to filing bankruptcy and she provided all of this information to the Debtors' attorney.  Exhibit 34 includes IRS Forms 1099 for 2015, which the Debtors provided Hoover during the course of litigation.  Most of these forms reflect income to DEC Construction, LLC, a separate legal entity formed in December 2014.

Hoover filed this adversary proceeding against the Debtors on December 8, 2015.  The Court entered an Order Denying Plaintiff's Motion for Partial Summary Judgment on August 9, 2016, incorporating its oral decision given on August 8, 2016.

A.  11 U.S.C. § 727(a)(4)(A)

Hoover alleges that the Debtors knowingly and fraudulently failed to report gross income of $602,035.99 in 2014, and gross income of $181,129.03 in 2015, and failed to disclose their litigation with Hoover, thereby warranting denial of their discharge.  Those objecting to discharge have the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied.  Courts liberally construe § 727 in favor of the debtor and strictly against those objecting to discharge.  Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

MEMORANDUM DECISION - 7

Section 727(a)(4)(A) provides that a court should grant a discharge to a debtor, unless the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account. A false statement or an omission in the debtor's schedules or SOFA can constitute a false oath. <u>Retz</u>, 606 F.3d at 1196. To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." <u>Retz</u>, 606 F.3d at 1197. The fundamental purpose of § 727(a)(4)(A) is to "insure that the trustee and creditors have accurate information without having to conduct costly investigations." <u>Fogal Legware of Switz., Inc. v. Wills (In re Wills)</u>, 243 B.R. 58, 63 (9th Cir. BAP 1999).

"A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." <u>Wills</u>, 243 B.R. at 62 (citing <u>In re Chalik</u>, 748 F.2d 616, 618 (11th Cir. 1984)). An omission or misstatement that "detrimentally affects administration of the estate" is material. <u>Retz</u>, 606 F.3d at 1198 (quoting <u>Wills</u>, 243 B.R. at 63). "A false statement or omission that has no impact on a bankruptcy case is not grounds for denial of a discharge under § 727(a)(4)(A)." <u>Wills</u>, 243 B.R. at 63.

"As used in Section 727(a)(4)(A), the term 'knowing' means that the debtor had a present awareness that the statement was untrue, and 'fraudulent' means that the debtor harbored an intent to deceive, such as an intent to hide assets or the true value of assets or to prevent discovery of transfers of property." <u>Joudeh v. Truppa (In re Truppa)</u>, Nos. 15-bk-11029-MT, 15-ap-01103-MT, 2016 WL 4400065, at *8 (Bankr. C.D. Cal. August 12, 2016). The plaintiff must establish that the debtor made the false statement with the intention and purpose of deceiving the creditors. <u>Retz</u>, 606 F.3d at 1198-99. "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." <u>Retz</u>, 606 F.3d at 1199 (quoting <u>Devers v.</u>

MEMORANDUM DECISION - 8

Bank of Sheridan, Mont. (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985)). "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." Retz, 606 F.3d at 1199 (citing Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 173-75 (9th Cir. BAP 2007), aff'd, 578 F.3d 1167, 1168 (9th Cir.2009)). "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts," but his reliance must be in good faith. First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986). "The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." Retz, 606 F.3d at 1199.

The Court finds that the Debtors did not omit material information regarding the Hoover litigation. While the litigation was not specifically disclosed in their schedules or SOFA, the Debtors listed Hoover's garnishment, which placed the chapter 7 trustee (Trustee) and creditors on notice of some underlying legal action with Hoover that resulted in the garnishment. Hoover is correct, however, that the Debtors omitted income information from their schedules and SOFA and never amended them to include this information, which amounts to a false oath. Nonetheless, the Court finds that Hoover has not established by a preponderance of the evidence that the omissions were material or made knowingly or fraudulently.

As to materiality, while a debtor's income bears a relationship to a debtor's estate, in this instance, there is no evidence that the omission of the Debtors' 2014 and 2015 gross income, or understatement of their 2013 gross income, impacted the bankruptcy case. See Wills, 243 B.R. at 63. Following conclusion of the § 341 meeting of creditors, the Trustee reported that he was investigating the existence and location of property of the estate not subject to exemptions or security interests. Two days later, however, the Trustee filed a Chapter 7 Trustee's Report of No Distribution. The Trustee has not pursued any action against the Debtors. Furthermore, there is no evidence that these omissions affected creditors. Ms. Poulin testified that the Debtors'

MEMORANDUM DECISION - 9

failure to list their 2014 income in their SOFA did not hinder or inhibit Hoover's ability to sue or collect money from DEC.  Ms. Poulin also was aware of additional income not reported, as much of it stemmed from issuance of Hoover's 2014 IRS Form 1099.

Even if the omissions were material, the Court finds credible Ms. Clement's testimony that she provided all the financial information she had to her attorney.  As to her 2014 income, Ms. Clement's testimony was credible that she believed she could not calculate her personal income until the business books for the year were closed and the Debtors' income tax return was prepared.  While it would have been better practice to have specified this in their SOFA, and to have later amended the SOFA, it is apparent from the testimony that the Debtors relied on their bankruptcy attorney and that their attorney appears to have provided minimal direction, at best, to his clients.  Ms. Clement's testimony also suggests that they confused gross income with net income for disclosure purposes, which is consistent with how the Debtors reported their 2013 income in their SOFA.  It appears that the attorney hired by the Debtors provided little legal assistance and merely acted more in the nature of a petition preparer.

As to the Debtors' 2015 income, the 2015 IRS Forms 1099 in Exhibit 34 indicate that most of the income was to DEC Construction, LLC, a separate entity formed in December 2014.

Further negating any finding of fraudulent intent is the Debtors' disclosures.  They listed Hoover as a creditor in the schedules and creditor list, as well as Hoover's garnishment in their SOFA.  The Debtors freely provided their 2014 and 2015 IRS Forms 1099 during discovery in this litigation.  There is no evidence that the Debtors had any intent to hide material information regarding their assets or otherwise deceive the Trustee and creditors.  Accordingly, Hoover has not met its burden in establishing denial of discharge under § 727(a)(4)(A).

B.       11 U.S.C. § 523(a)(2)(A)

Hoover also contends that the Debtors should be denied discharge of the Judgment under § 523(a)(2)(A) because of their false representations and material omissions with respect

MEMORANDUM DECISION - 10

to the Progress Releases. Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To except a debt from discharge under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence the following elements:

> (1) the debtor made . . . representations;
> (2) that at the time he knew they were false;
> (3) that he made them with the intention and purpose of deceiving the creditor;
> (4) that the creditor relied on such representations; [and]
> (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010) (quoting Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996)).

1.     False Representations

Hoover alleges that the Debtors made false representations in two ways: (1) failing to inform Hoover that the Debtors were not current in paying the subcontractors; and (2) not using the funds to pay the subcontractors in full, contrary to the representations contained in the Progress Releases.

Hoover first argues that the Debtors had a duty to inform Hoover that they were not current on payments to the subcontractors and had not made any payments to E-Squared. Consequently, the Debtors' failure to inform Hoover of these facts constitutes a false representation under § 523(a)(2)(A). A debtor's failure to disclose material facts is actionable under § 523(a)(2)(A) if the debtor was under a duty to disclose and the omission was motivated by an intent to deceive. Jadallah v. Carroll (In re Carroll), 549 B.R. 375, 381 (Bankr. N.D. Cal. 2016) (citing Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 n.4 (9th Cir. 2001)). The court looks to state law to determine whether there is a duty to disclose. See Carroll, 549 B.R. at 382 (where court examined California law to determine when a duty to disclose arises).

**Below is a Memorandum Decision of the Court.**

Hoover relies on a bankruptcy decision that applied California's law on duty to disclose and held that a contractor had a duty to inform the lender that subcontractors were not being paid on a construction project. <u>Carroll</u>, 549 B.R. at 383-84.  Hoover also relies on an unpublished decision by Division I of the Washington Court of Appeals, <u>Mastro v. Horbach</u>, 95 Wn. App. 1008 (1999).[2]  In that case, the court held that a contractor has a duty to present accurate draw requests to a financier with an ownership in the property because it is reasonable to assume that the financier/owner will rely on a contractor's draw requests as an accurate statement of the money owed for the tasks accomplished. <u>Mastro</u>, 95 Wn. App. at *5.

While <u>Carroll</u> and <u>Mastro</u> provide authority for Hoover's position, Hoover has provided no *binding* authority establishing that under Washington State law, the Debtors had a duty to disclose to Hoover that they were not paying their subcontractors.  <u>Mastro</u>, while seemingly on point, appears to be a stand-alone case that in accordance with Wa. R. Gen. GR 14.1(a) provides no precedential value and is not binding on any court.  Hoover cited no opinion published before or after the 1999 <u>Mastro</u> opinion that reached a similar conclusion.  Absent conclusive Washington State law imposing a duty to disclose, this Court does not have the authority to impose such a duty on the Debtors for purposes of § 523(a)(2)(A).  Nevertheless, Hoover has established false representations under their second theory.

Hoover argues that when the Debtors submitted the signed Progress Releases dated September 29, October 20, and November 24, 2014, they represented that the Debtors had already paid or would use the progress payments to pay in full all subcontractors who had furnished labor and materials to date on the Electrical Project.  The evidence establishes that subcontractors, including Platt Electric Supply, Tradesman International, E-Squared Systems, LLC, and Sunbelt Rentals, Inc., were not paid in full with the progress payments.  Ms. Clement's

---

[2]  The Court recognizes that Wa. R. Gen. GR 14.1(a) provides that "[u]npublished opinions of the Court of Appeals have no precedential value and are not binding upon any court."  Further, such opinions filed on or after March 1, 2013, may be cited as non-binding authorities.  <u>Mastro</u> was filed in 1999.

MEMORANDUM DECISION - 12

testimony establishes that the Debtors had prior experience with the Progress Releases and understood the language contained in the releases. While the Debtors argue they did not represent that they would not pay themselves with the progress payments, the issue is whether the Debtors represented they would pay the subcontractors what they were owed to date and whether they in fact did pay them. Hoover has established by a preponderance of the evidence that the Debtors made false representations that all laborers, subcontractors, material men and suppliers were current when signing the Progress Releases.

The evidence also establishes that through the signed Final Unconditional Lien Waiver, the Debtors represented that receipt of the $440,930.65 constituted the entire balance due for all work performed and materials supplied by DEC and their subcontractors. There is no dispute that Hoover thereafter was required to pay additional amounts to subcontractors who had not been fully paid. While this also constitutes a false representation, because Hoover admittedly did not rely on this statement in making payments to the Debtors, this false statement is not a basis for damages under the legal theories advanced by Hoover.

2.   <u>Knew Representations Were False</u>

Hoover contends that the Debtors knew their representations in the October 20 and November 24, 2014 Progress Releases were false. Specifically, they argue that the Debtors were aware of outstanding invoices as of those dates and they controlled which subcontractors were paid on the Electrical Project. Despite this, the Debtors signed and submitted Progress Reports, which warranted that the subcontractors had been or would be paid in full from the progress payments for labor and materials provided to date. The evidence establishes that the Debtors failed to pay in full six Electrical Project subcontractors from the progress payments: Tradesman, Platt Electric, E-Squared, Sunbelt Rentals, United Rental, and Intracommunications Network. Furthermore, Ms. Clement's testimony establishes that the Debtors knew they were behind on paying job expenses at the time of both the October 20 and

MEMORANDUM DECISION - 13

November 24 Progress Releases. Hoover has established by a preponderance of the evidence that the Debtors knew their representations were false.

3.     <u>Intent to Deceive</u>

For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor. <u>Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)</u>, 258 B.R. 192, 198 (9th Cir. BAP 2001). Because direct evidence of intent to deceive is rarely available, "the intent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth." <u>Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)</u>, 237 B.R. 160, 167-68 (9th Cir. 1999). The court may find intent "where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." <u>Khalil</u>, 379 B.R. at 174. The intent to defraud a creditor is a finding of fact. <u>Rubin v. West (In re Rubin)</u>, 875 F.2d 755, 758 (9th Cir.1989).

Hoover contends that the Debtors engaged in a pattern of falsity, as the October and November Progress Releases and the Final Lien Release were patently false and misleading. Hoover argues that further evidence of fraudulent intent is demonstrated by the Debtors' compensation draws for personal use while subcontractors went unpaid.

While the Court is sympathetic to Hoover's position, Ms. Clement's testimony, which the Court finds credible, does not support a finding of fraudulent intent through a pattern of falsity or otherwise. The Debtors entered the Electrical Project believing they had bid it so as to allow an estimated 30% profit. Further, they were aware that 10% of the funds were being retained by Hoover in case of a shortfall. They later learned, while in the midst of the project, that due to an error by their estimator, they had significantly underbid the project. Ms. Clement testified that she wanted to do a good job and always intended to pay her subcontractors in full. Up through the November 24 progress payment, the Debtors believed they could somehow fulfill the contract requirements. While the Debtors' hopes may not have been grounded in reality, a preponderance of the evidence does not indicate that the Debtors recklessly disregarded the

MEMORANDUM DECISION - 14

truth. The testimony of both Ms. Poulin and Ms. Clement is that for contracts such as the Electrical Project, the profit, if any, cannot be determined until the end of the project and after all job related expenses are paid. Thus, there was a basis for the Debtors to believe that perhaps they could still meet their contractual payment obligations on the Electrical Project, particularly when considering the 10% retainage and expected 30% profit.

The Debtors' compensation draws do not change the outcome. The Debtors made modest draws of $1,000 per week for both of them while working on the Electrical Project. Excluding the involuntary IRS payment, they received only $20,000 from September through November 2014. Furthermore, there is no evidence that they withdrew any of the November 24 progress payment for their own compensation. Ms. Clement testified that the IRS withdrew the approximately $27,000 in December 2014 without the Debtors' knowledge or permission; there is no evidence to the contrary.

Additionally, while the Progress Releases specify that the signor "has already paid or will use the funds received from this progress payment to promptly pay in full" all subcontractors, the Progress Release does not specify that signors may not use any of the progress payments to compensate themselves. The Debtors, while owners of DEC, also were both employed by DEC—Ms. Clement as a contract and office administrator and Mr. Clement as a job site supervisor and journeyman. As sole proprietors, it is not unreasonable for the Debtors to have interpreted the Progress Releases as not excluding payments to them for their work on the Electrical Project. Ms. Clement's testimony is consistent with this, as she believed the Debtors' compensation draws were part of the job related expenses.

Finally, the Court is aware that the Debtors failed to inform Hoover that they were behind on payments during the Electrical Project, and failed to inform Hoover that there were additional suppliers owed money as of the Final Unconditional Lien Waiver. Based on Ms. Clement's credible testimony, however, there is no evidence that the Debtors remained silent in order to

MEMORANDUM DECISION - 15

deceive Hoover. There is no dispute the Debtors completed the Electrical Project to the satisfaction of Hoover. They also completed without incident the demolition bid on the Project awarded them at the same time as the Electrical Project. To find that every time a progress payment was made, the Debtors unconditionally warranted that every expense was paid in full, is to ignore the realities of construction contracting where often supplies are ordered and work performed that cannot yet be billed. This is particularly the case here where, with the estimated 30% profit and 10% retainage, the Debtors had built in what they believed was a 40% cushion. Hoover has not established by a preponderance of the evidence an intent to deceive by the Debtors. Nonetheless, the Court will examine the remaining two elements.

4.  <u>Justifiably Relied on Statements</u>

Under § 523(a)(2)(A), a party objecting to discharge need only prove that it "justifiably" relied on the debtor's fraudulent statements. The objecting party does not need to prove that the reliance was reasonable. <u>Citibank (South Dakota), N.A. v. Eashai (In re Eashai)</u>, 87 F.3d 1082, 1090 (9th Cir. 1996). Justifiable reliance turns on a person's knowledge under the particular circumstances. <u>Eashai</u>, 87 F.3d at 1090. Ms. Poulin's testimony establishes that before issuing any progress payments, Hoover reviewed and verified the Progress Releases submitted by the Debtors. This included verifying what the Debtors billed and comparing it to the percentage of the project completed. Hoover employed a full-time site supervisor to oversee the project and provide feedback to Ms. Poulin regarding the status of the project. Ms. Poulin further testified that she did not learn that subcontractors had not been paid until December 2014, after the fourth and last Progress Release submitted by the Debtors.

The evidence indicates that two of the progress checks were dated prior to the dates on their respective Progress Releases: checks issued on September 4 and October 17, 2014. Only the latter check and Progress Release are relevant here. While this could negate Hoover's assertion of reliance on the October 20 Progress Release, there was no testimony or evidence

MEMORANDUM DECISION - 16

that the check, although dated October 17, was given to the Debtors before they signed and submitted their Progress Release.   Exhibit 9 further shows that the check was not deposited into the DEC bank account until October 22, 2014, after the Progress Release.

Accordingly, Hoover has established by a preponderance of the evidence that Hoover relied on the October 20 and November 24 Progress Releases before paying the Debtors, and Hoover's reliance was justifiable.

5.    <u>Damage as a Proximate Result</u>

Hoover contends that it sustained damages as a result of the Debtors' false representations in their October 20 and November 24 Progress Releases.   In addition to the contract price on the Electrical Project, Hoover presented evidence that it was required to pay the balances owed to E-Squared and Sunbelt Rentals, totaling $44,000.90.   It also incurred expenses defending and evaluating the lien claim, for damages totaling $66,003.42, as reflected in the Judgment entered against the Debtors.   In their briefing, the Debtors argued that Hoover failed to mitigate its damages as to the $64,098.82 to Tradesman, but there was no evidence presented refuting the amounts Hoover had to pay in excess of the final contract amount for the Electrical Project.   The Court finds that Hoover has established by a preponderance of the evidence that it sustained damages as a result of the Debtors' false representations.   The Court need not determine the amount of damages, however, as Hoover has not met its burden of proof in establishing nondischargeability of debt under § 523(a)(2)(A).

Having failed to establish each element of § 523(a)(2)(A) by a preponderance of the evidence, Hoover has not established that the Judgment should be excepted from discharge under § 523(a)(2)(A).

C.      11 U.S.C. § 523(a)(4)

Hoover contends that an express trust existed for payments made by Hoover to the Debtors for purposes of paying the subcontractors on the Electrical Project.   Hoover argues that

MEMORANDUM DECISION - 17

the express trust is a fiduciary relationship, subjecting the holder of the property—the Debtors—to equitable duties to deal with the property for the benefit of another person.

Section 523(a)(4) excepts from discharge any debt resulting from fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The broad general definition of a fiduciary—a relationship involving confidence, trust, and good faith—does not apply in the dischargeability context, thereby excluding ordinary commercial relationships from the reach of § 523(a)(4). Lewis v. Short (In re Short), 818 F.2d 693, 695 (9th Cir. 1987). Implied or constructive trusts and trusts ex malefico also do not create the fiduciary relationship required by § 523(a)(4). Short, 818 F.2d at 695. The required fiduciary relationship must arise from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt. Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996). In determining whether a person is a fiduciary within the strict and narrow sense of § 523(a)(4), reference must be made to state law. Lewis, 97 F.3d at 1185. "If state law does not 'clearly and expressly impose trust-like obligations on a party,' courts 'will not assume that such duties exist and will not find that there was a fiduciary relationship.'" Houng v. Tatung Co. (In re Houng), 636 Fed. Appx. 396, 398 (9th Cir. 2016) (quoting 4 Collier on Bankruptcy, ¶ 523.10 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

 Once a creditor establishes that a fiduciary relationship exists, the Bankruptcy Code incorporates the common law principle that the burden then shifts to the debtor to account for the property entrusted to the debtor by the creditor; thus a debtor-fiduciary has the burden of establishing that a defalcation did not occur. Otto v. Niles (In re Niles), 106 F.3d 1456, 1461-62 (9th Cir. 1997).

Hoover relies on a Washington Court of Appeals, Division I, case to support its position. Westview Invs., Ltd. v. U.S. Bank Nat'l Ass'n, 133 Wn. App. 835 (2006). In Westview, the appellate court considered whether the construction contracts between a project owner and

MEMORANDUM DECISION - 18

general contractor created express trusts. The court acknowledged that Washington, unlike other states, has not adopted legislation expressly imposing trust characteristics upon progress payments made to general contractors for the benefit of subcontractors pursuant to construction contracts. <u>Westview</u>, 133 Wn. App. at 845. Thus, the court looked to the language of the contracts, which were American Institute of Architects (AIA) standard form contracts.[3]

Paragraph 9.6.2 of the AIA General Conditions provides:

*The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled,* reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work.

Section 9.6.7 provides:

Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, *payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner.* Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

<u>Westview</u>, 133 Wn. App. at 846 (emphasis in original). The court also relied on AIA published commentary, which states that "[t]his precludes the contractor from using money received for subcontractors' work for other purposes," and "[t]his requirement establishes a trust in favor of subcontractors and suppliers of monies received by the contractor by reason of work and materials of its subcontractors and suppliers." <u>Westview</u>, 133 Wn. App. 847.

---

[3] The court relied on the following definition of "express trust:"

" 'An express trust is one created by the act of the parties; and where a person has, or accepts, possession of money, promissory notes, or other personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold and apply it for certain specified purposes, an express trust exists.' "

<u>Westview</u>, 133 Wn. App. at 845-46 (quoting <u>State v. Southard</u>, 49 Wn. App. 59, 63 n.3 (1987)).

MEMORANDUM DECISION - 19

The court concluded that the contract language evinced "an express understanding on the part of the general contractor that it is not to hold the progress payments as its own absolute property, but to hold and apply them for certain specified purposes, that is, for the benefit of the subcontractors." Westview, 133 Wn. App. at 847. As such, the general contractor was the trustee, the subcontractors were the beneficiaries, and the progress payments were the trust res. Westview, 133 Wn. App. at 845.[4]

Hoover also cites to the Ninth Circuit Court of Appeals (Ninth Circuit) case Houng, 636 Fed. Appx. 396. There, the debtor was the chief executive officer of a company that had become insolvent. The Ninth Circuit held that fiduciary duties imposed on the debtor under California's "trust fund doctrine," to preserve the insolvent company's assets in trust for the benefit of its creditors, were sufficient to place the debtor in a "fiduciary capacity" to creditors for purposes of nondischargeability under § 524(a)(4). Houng, 636 Fed. Appx. at 399. In reaching this holding, the Ninth Circuit recognized that "California courts adhere to the 'trust fund doctrine,'" which "'clearly and expressly impose[s] trust-like obligations'" on the controllers of any insolvent entity. Houng, 636 Fed. Appx. at 398-99.

In order for this Court to conclude that the contracts between the Debtors and Hoover created an express trust and imposed a fiduciary duty on the Debtors, the Court must first determine that Washington law "clearly and expressly" imposes trust-like obligations on contractors like the Debtors for the benefit of their subcontractors. The Court concludes that it cannot. Other than Westview, the Court was unable to find any caselaw that applied Washington law and imposed a fiduciary duty based on similar or analogous facts.

Moreover, Westview is distinguishable from the case here. In Westview, the contract language expressly provided that payments received by the contractor for work performed by

---

[4] Notably, the court also held that the language in Section 9.6.7 after the italicized language did not negate the trust, based on decisions by the Washington State Supreme Court. Westview, 133 Wn. App. at 847-48.

MEMORANDUM DECISION - 20

subcontractors and suppliers "shall be held" for the subcontractors and suppliers. Here, the Contract contains no such language, or even language addressing the Debtors' obligations to their subcontractors or suppliers. Additionally, the Progress Releases, while setting forth the requirement that the Debtors use funds received from Hoover to pay their subcontractors in full, also do not contain "holding" language like that in <u>Westview</u>. Thus, there is no objective manifestation of a mutual intent by Hoover and the Debtors to create an express trust. Finally, in the instant case, there is no authority like the AIA commentary that expressly states the contract language creates a trust. Because Washington law does not "clearly and expressly" impose trust-like obligations on contractors under the facts in this case, Hoover has not established that a fiduciary relationship existed between the Debtors and their subcontractors and suppliers for the Electrical Contract. Accordingly, Hoover has not established nondischargeability of debt under § 523(a)(4).

To summarize, Hoover dismissed its claims under § 523(a)(2)(B) and (a)(6), and the Court has determined that Hoover failed to establish by a preponderance of the evidence denial of discharge under § 727(a)(4), and nondischargeability of debt under both § 523(a)(2)(A) and (a)(4).

///End of Memorandum Decision///

MEMORANDUM DECISION - 21